Filed 8/18/14  P. v. Quevado CA2/6
# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESUS CUELLO QUEVADO,<br><br>    Defendant and Appellant. | 2d Crim. No. B247139<br>(Super. Ct. Nos. 1351641, 1358286)<br>(Santa Barbara County) |

Jesus Cuello Quevado appeals from the judgment entered following his conviction by jury of first degree robbery (Pen. Code, § 211, 213,[1] counts 1 & 8); first degree burglary (§ 459, counts 2, 3 & 9); assault with a firearm (§ 245, subd. (b), count 4); grand theft of a firearm (§ 487, subd. (d)(2), count 5); attempted robbery (§§ 664/211, count 6); attempted first degree burglary (§§ 664/459, count 7); street terrorism (§ 186.22, subd. (a), count 10); and one count of possession of ammunition (§12316, subd. (b)(1), count 11).  The jury also found multiple gang benefit and personal firearm use allegations were true (§§ 186.22, subd. (b)), 12022.53, subd. (b), 12022.5, subd. (a)).  In bifurcated proceedings, the trial court found that appellant had suffered two prior serious felony (§ 667, subd. (a)(1)) and two prior strike convictions (§§ 667, subd. (b)-(i), 1170.12, subds. (a)-(d)).  The court denied a motion to dismiss one of his strike

---

[1] All statutory references are to the Penal Code unless otherwise stated.

convictions (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497) and sentenced appellant to serve 140 years to life, plus a determinate term of 38 years, in state prison.

Appellant contends that (1) the trial court deprived him of his constitutional right to cross examine investigating officers regarding their use of a false affidavit; (2) the court failed to instruct jurors that the testimony of in-custody informant witnesses must be corroborated; (3) there is not substantial evidence to support the count 6 attempted first degree robbery; (4) the court erred by denying his *Romero* motion; and (5) his sentence constitutes cruel and unusual punishment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

Appellant belonged to West Park, a criminal street gang in Santa Maria, and used the moniker "Big Boy." He also belonged to the Surenos, an association which has authority over local Southern California gangs. Surenos has about 300 members who exert extensive influence inside and outside prison. For example, it assesses large taxes (1/3 of profits) on gang members who sell drugs. Appellant claimed to be the Surenos' "llavero" (key holder) in Santa Maria. That compelled other gang members to comply with his orders.

*September 17, 2010 - Invasion of the Fuentes Home* (*Santa Maria*)

Appellant recruited West Park gang members Angelica Trevino and Francisco Veloria (Pancho) to help him invade Jennifer Fuentes' home on West Hermosa in Santa Maria and rob her boyfriend, Gilbert Montoya, who lived there. Gilbert was a drug dealer and a "rat," who was reportedly storing $25,000 in cash, three pounds of marijuana and three pounds of methamphetamine in Fuentes' home. Because Fuentes would only open her door for women, appellant needed Angelica's help to access Fuentes' home. Angelica agreed to help because her brother needed money to hire a lawyer, and she believed she would receive half of the cash recovered in the robbery.

On September 17, 2010, appellant and Pancho picked up Angelica in a white truck. Appellant drove them to Fuentes' home. Holding appellant's nonfunctioning .22 caliber revolver, Angelica approached Fuentes' door and knocked. As soon as Fuentes answered the door, Angelica pushed her way inside. Fuentes dropped to the

2

floor and curled up. Angelica insisted she stay down and covered her with a jacket. Pancho and appellant entered the home, clothed in black. They found no drugs but took some inexpensive jewelry and $6,000. Appellant told Angelica they had not recovered any money. After Angelica was charged for the September 17 invasion of Fuentes' home, she learned that the robbers took $6,000. That angered her and she agreed to testify for the prosecution as part of a plea bargain, in exchange for a shorter sentence.

*October 21, 2010 - Invasion of the Stickley Home* (*Santa Ynez*)

Frank Stickley lived in his Santa Ynez home on Cimarron Drive, with his wife, their daughter, and their young adult niece, Syeira Doe. On October 21, 2010, Doe was home alone, in her room, getting ready for work when she the doorbell rang. She thought it was her cousin, and did not answer the door. A stranger (appellant), entered her room and asked, "What are you doing?" She answered, "Nothing." Appellant pointed a semi-automatic pistol at her, and told her to get down. Doe complied. He left a few minutes later. Doe called her family. Police responded minutes later. Doe described the suspect to them as a man of "average build," with a buzz cut and facial hair, who was about six feet tall. He wore a sports jersey and held a dark briefcase. Upon checking the house, Stickley found that $20,000 worth of jewelry and a nine millimeter semi-automatic pistol were missing from a bedroom closet. Doe later identified appellant as the stranger who entered her home on October 21.

*November 24, 2010 - 2nd Invasion of the Fuentes Home - * (*Santa Maria*)

On November 24, 2010, in the early afternoon, appellant asked Ronald Claborn to help Silviano Contreras (Chano) and Fernando de Los Santos (Ogre) invade Gilbert's house (Fuentes' home) and take whatever they could. (Chano belonged to Guadalupe gang and Surenos.) Appellant drove a black Chrysler 300 toward Fuentes' home, followed by Ronald, who drove his gold Buick, with Chano and Ogre riding as passengers. Appellant and Ronald parked their cars near Fuentes' home. Orge and Chano scaled a fence into Fuentes' yard. Fuentes saw them from her window. Frightened, she called the police. She heard someone "jiggle" her locked front gate, and saw someone jump her fence and enter a gold Buick. Fuentes took her step-daughter to

3

her car. As she pulled her car away, Fuentes saw a gold Buick and a black Chrysler 300 drive away at high speeds.

*November 24, 2010 –Invasion of the Soto Home* (*Nipomo*)

Later, on the same day, Ronald was with appellant and a member of the Guadalupe gang and Surenos. They talked about doing "the robbery or home invasion," a reference to an October conversation when appellant had asked Ronald if he had ever "done a home invasion." He also asked if Ronald knew of any good places. Ronald said that he "could go for a ride." Ronald took appellant and Chano for a ride on November 24, in his gold Buick. They went to Nipomo and searched for a house where nobody was home. Chano knocked at the door of a house that "looked expensive." Nobody answered. Its door was unlocked. Chano entered the attached garage which held a Sentra car with its keys inside. They moved the Sentra and parked it a block away, and Ronald parked his car in its place. Chano entered the home and saw a woman (Justina Soto) asleep in the bedroom. He told appellant and Ronald she was there, and they all went inside.

Soto saw two strange men enter her bedroom. She described one of the men (appellant) as wearing a white sweatshirt, blue jeans, a black hat, and a white rag that was tied across his face. She estimated he was about five feet, nine inches tall, with a thin build. She described the other man (Ronald) as wearing a black hat, a black sweatshirt, black jeans, and white rag that covered most of his face. She estimated he was about five feet, four inches tall, with a medium build. Ronald hit Soto with a pillow and told her to be quiet. Appellant pulled clothing from Soto's closets and drawers and threw it around her room. After a light shone from the bathroom, appellant and Ronald ran from Soto's room. She ran after them, and pushed a button that triggered an alarm sound. Soto noticed a third intruder run from another bedroom. All three men ran toward her garage. Her gray Sentra, its keys, and her purse were missing after the men left.

On December 8, 2010, several Santa Barbara County Sheriff department officers went to appellant's residence to conduct a parole search. They recovered a rifle which contained a spent .22 caliber cartridge casing. There was a black Chrysler 300 in appellant's driveway. Appellant was home. The officers searched him and found the

Chrysler keys. They searched the Chrysler. Its trunk contained a gym bag which held a Raiders jersey, white shirts, toiletries, a box of .38 caliber ammunition, and six empty casings.

*Defense Evidence*

The defense called several witnesses, including Emmanuelle Gonzalez. Emmanuelle testified that in August or September, 2012, Ronald said he would be providing false testimony against appellant. Flor Elizabeth Fuentes, appellant's fiancé, testified that she owned the black Chrysler described by prosecution witnesses, and that it was driven by her, and John Stoney, Jr., as well as appellant. She further testified that John told a defense investigator he had placed ammunition in the Chrysler's trunk.

DISCUSSION
*Denial of Cross Examination Concerning Officers' Use of a False Affidavit*

Appellant contends the trial court deprived him of his constitutional right to cross examine investigating officers regarding their use of a false affidavit. We disagree.

A defendant has a constitutional right to confront trial witnesses against him. (U.S. Const., 6th Amend.; Cal.Const., art. I § 15.) "'The right of confrontation is not absolute, however.'" (*People v. Williams* (2013) 58 Cal.4th 197, 264.) "'A trial court has broad discretion under Evidence Code section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence "'"to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]'" [Citations.]'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 808-809.)

*Background*

After appellant's December 8, 2010 arrest, he was charged in Case No. 1351641 with weapons offenses. On April 13, 2011, Santa Maria Police Department officers Michael Parker and Dan Cohen showed appellant a false affidavit to stimulate his conversation with a cellmate (who was a wired informant) and obtain incriminating

5

statements.[2]  The officers used "a portion of a valid court order (search warrant) to authenticate a false affidavit."  They had arranged for appellant's transport to the court house and his placement in a cell with a wired informant.  Before using the false affidavit, Cohen "consulted with then Chief Assistant District Attorney Ann Bramsen, about the ruse, describing it in concept, and asked if the use of a false affidavit would violate the law or defendant's rights."  Neither Bramsen nor Cohen "recall[ed] if they discussed [the fact] that the false affidavit would be served with a valid search warrant face sheet . . . from another case."  Bramsen advised Cohen "the false affidavit was lawful, if used as a ruse."

The prosecution charged appellant with the 2010 home invasion robberies, in Case No. 1358286.[3]  His counsel learned of the April 13, 2011, police ruse and moved for sanctions against the prosecution and law enforcement.  The court (Hon. Kay S. Kuns) heard the motion and issued a written ruling and findings.  Judge Kuns ruled "that any evidence seized pursuant to the ruse, including alleged adoptive admissions, be excluded."  She found the officers did not intend to violate the law in using the ruse and that Bramsen did not know the specific mechanics of the ruse.  The court further found the ruse "erode[d] the integrity of the judiciary and its orders;" "diminish[ed] the respect for court orders;" and placed one victim and her neighbors, "in greater danger of harm or witness intimidation."  Judge Kuns concluded that "at the very least" the police ruse "skirted the boundaries . . . and perhaps violated the spirit," of Government Code section 6201, "which makes it unlawful . . . to alter or falsify any public document."

Following Judge Kun's ruling the district attorney dismissed and refiled the case.  It contemporaneously filed a peremptory disqualification of Judge Kuns.  The newly filed case was assigned to Judge Edward Bullard who ruled that "Judge Kuns'

---

[2]  At trial, Parker testified as a gang expert.  He opined that appellant was a member of West Park gang and Sureno and that the crimes were committed for the benefit of the gang.  Cohen testified about the parole search of appellant, his home and car, and appellant's statements. He also testified regarding Nevarez, and statements Angelina and Valdez made concerning some of the charged crimes.

[3]  Case No. 1358286 was consolidated into the Case No. 1351641 before trial.

ruling [excluding the evidence acquired through the police ruse] stands." Judge Bullard also ruled that appellant could not present evidence of the police ruse at trial because it was not relevant to the issues.

Judge Bullard's ruling excluding evidence of the police ruse did not violate appellant's right to confrontation. The police ruse had no direct bearing on the material facts. Its introduction would have involved time-consuming questioning of the officers concerning collateral matters. The trial court's exercise of discretion under "'Evidence Code section 352 to exclude evidence of marginal impeachment value . . . generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.' [Citation.] '. . . [T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation.]" (*People v. Ricardi, supra,* 54 Cal.4th at pp. 909-910.) Moreover, even if the court erred by precluding appellant's use of the ruse evidence for impeachment, its error was harmless under any standard of review. The relevant questions are whether appellant can show a reasonable probability that he would have achieved a more favorable trial outcome but for the error (*People v. Watson* (1956) 46 Cal.2d 818, 836) and whether this particular error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24). Appellant cannot meet either standard, in view of the overwhelming evidence of guilt presented at trial and the marginal relevance of the police ruse evidence.

*Sufficiency of the Evidence*

Appellant argues there is not sufficient evidence to support the count 6 attempted robbery at Fuentes' home on November 24. More specifically, he argues there is not sufficient evidence of his intent to rob anyone. We disagree.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We must accept

7

logical inferences that the jury might have drawn from the evidence although we could have concluded otherwise. (*Streeter,* at p. 241.)

Ronald testified that on November 24, appellant asked him to help "strong arm" Gilbert into "handing over" his drug sales profits. That request supports the inference that appellant intended to rob someone at Fuentes' home, if necessary, to achieve his goal of taking Gilbert's money. In fact, appellant and his accomplices had robbed Fuentes on September 17 in the same house. Moreover, Ronald and appellant robbed another victim (Soto) in her home on November 24. In arguing his lack of intent to rob anyone at Fuentes' home on that date, appellant stresses that Ronald also testified the "plan was to go and knock on the door, if nobody was there [or] if nobody answered, try to get into the house, try to find his stash, his money, get it if we could, come out of the house with it." The fact that the evidence could have supported a finding that appellant lacked the intent to rob anyone as alleged in count 6 does not warrant a reversal of the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

*In-Custody Informant Instruction (CALCRIM No. 336)*

Appellant contends the trial court committed reversible error by failing to instruct the jury that the testimony of an in-custody informant must be corroborated, as required by section 1111.5. Respondent concedes the error but urges that appellant was not harmed by it. We agree. In determining if the error was harmless, we apply the *Watson* standard. (*People v. Watson*, *supra,* 46 Cal.2d at p. 836; *People v. Davis* (2013) 217 Cal.App.4th 1484, 1490.)

Appellant was tried in 2012. Section 1111.5, which went into effect on January 1, 2012, describes the corroboration requirement for testimony of in-custody informants as follows: "(a) A jury or judge may not convict a defendant . . . based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense . . . to which the in-custody informant testifies . . . . [¶] (b) As used in this section, "in-custody informant" means a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held

8

within a city or county jail . . . ." (*Ibid*.; *People v. Davis, supra,* 217 Cal.App.4th at p. 1488, fn. omitted.)

The current version of CALCRIM No. 336 incorporates the section 1111.5 corroboration requirement. The trial court instructed the jury with an older version of CALCRIM No. 336 which lacked the corroboration requirement but cautioned the jury that it must view "testimony of an in-custody informant . . . with caution and close scrutiny [and] consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness." (CALCRIM No. 336.) The court also instructed the jury that Valdez and Nevarez were in-custody informants.

It is not reasonably probable that the jurors would have reached a result more favorable to appellant if the court had instructed them properly concerning the section 1111.5 corroboration requirement for the testimony of in-custody informants. (*People v. Davis, supra*, 217 Cal.App.4th at p. 1490.) To the extent it was incriminating, the testimony of the in-custody informants was substantially corroborated. For example, their combined testimony showed appellant's affiliation with Surenos and his membership in West Park. That incriminating testimony was corroborated by Angelica, Ronald, and the prosecution gang expert. The testimony of Angelica and Ronald also corroborated informant Valdez's testimony that appellant admitted his involvement in the Santa Ynez home invasion and two invasions of Fuentes' home in Santa Maria. Valdez further testified that appellant said authorities would fail in their attempts to connect him to photographs from the Chumash Casino because he did not use his own phone while he was there. That testimony was not particularly damaging because it lacked an explicit admission of a crime. Informant Nevarez gave incriminating testimony that appellant said he had designed a way to defeat the possession of ammunition charge. While that testimony was not corroborated, it was insignificant because officers essentially caught appellant "red-handed," with ammunition in his car trunk, during the December 8, 2012, parole search.

9

*Sentencing Claims*

Appellant claims that the court abused its discretion in denying his *Romero* motion to strike one of his prior strike convictions, and that his sentence is disproportionate and constitutes cruel and unusual punishment. We disagree.

A trial court may strike or dismiss a prior conviction allegation. (§ 1385; *Romero*, *supra*, 13 Cal.4th at p. 504.) A trial court's refusal to strike a prior conviction allegation is reviewed under the highly deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) Under that standard, the party seeking reversal must "'. . . clearly show that the sentencing decision was irrational or arbitrary.'" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.) It is not enough to show that reasonable people might disagree about whether to strike a prior conviction. (*Carmony*, at p. 378.) Only extraordinary circumstances justify a finding that a career criminal is outside the three strikes law. (*Ibid*.) Therefore, "the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid*.)

The record reveals no basis for a conclusion that appellant falls outside the spirit of the three strikes law. He was released from prison on August 5, 2010. By late November, he had committed four separate home invasions, and robbed, or attempted to rob, the resident victims. In seeking the dismissal of one of appellant's prior strike convictions, defense counsel asserted that no victim of his crimes suffered serious injury. The trial court discussed the long-term emotional devastation suffered by victims who are robbed at home by armed intruders even absent serious bodily injury, and stated appellant's crimes "were horrendous." The court reasonably concluded that appellant is the kind of revolving-door career criminal for whom the three strikes law was devised. (See *People v. Gaston* (1999) 74 Cal.App.4th 310, 320.)

Appellant further contends his sentence is grossly disproportionate to his offense and constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. In *Rummel v. Estelle* (1980) 445 U.S. 263, 274, the United States Supreme Court upheld a mandatory life sentence under a Texas recidivist statute even though the defendant had been convicted of obtaining $120.75 by false

10

pretenses and his prior convictions consisted of two nonviolent felonies. The Court reasoned that the sentence under a recidivist statute is "based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes." (*Id*. at p. 284.) The statute serves the legitimate goal of deterring repeat offenders and of segregating the recidivist "from the rest of society for an extended period of time." (*Ibid*.) Since appellant's strikes include violent offenses, the justification for a life sentence here is more compelling than in *Rummel*.

Appellant also contends that his sentence violates the state constitutional prohibition against cruel or unusual punishment. (Cal. Const., art. I, §17.) A punishment violates the state constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) In arguing his sentence was disproportionate, appellant stresses that nobody was shot, injured, killed, or tortured as the result of the crimes. As the trial court explained, the absence of bodily injury does not change the fact that appellant committed horrendous crimes which destroyed the victims' sense of safety in their own homes. Appellant's sentence was warranted because of his recidivism, and the circumstances of his recent offenses, including his leadership role in them. (See *People v. Martinez* (1999) 71 Cal.App.4th 1502.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PULISHED.

PERREN, J.

We concur:



GILBERT, P.J.



YEGAN, J.

11

Edward H. Bullard, Judge

Superior Court County of Santa Barbara

_____

Richard C. Gillman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.